## VILCE v. LAKE CHARLES STEVE-DORES, Inc.*
### No. 1348.

Court of Appeal of Louisiana. First Circuit. June 11, 1934.

*Rehearing denied June 30, 1934. Writ of error denied Aug. 3, 1934.

M. R. Stewart, of Lake Charles, for appellant.

McCoy, Moss & King, of Lake Charles, for appellee.

MOUTON, Judge.

Plaintiff, an employee of defendant corporation, during the course of his employment, suffered an injury on October 14, 1932.

He is suing defendant for compensation for permanent total disability to do work of any reasonable character.

He appeals from a judgment rejecting his demand.

It is shown that plaintiff was coming out of a car with paper in his hands, when he was struck by a truck on his right side and was jammed on his left side against the side of the door of the car. On this truck were three rolls of paper each weighing about 500 pounds, making a total in weight of about 1,500 pounds. The weight of this truck was about 400 pounds.

Plaintiff testifies he remained in this jam until Eddie Mayo "pulled the truck off of me."

Eddie Mayo testifies that when he came back from the house to the car, he found plaintiff jammed between the truck and the door of the box car, and that he pulled the truck away from the plaintiff into the house.

Thorne and Rankin, apparently laborers with plaintiff at the time, witnesses for defendant, testify that he was struck on the side by the truck, but say they did not see him jammed against the door of the box car.

Plaintiff left the docks, where he was working when the accident occurred, returned the day following, and was sent to Dr. Howell for medical attention. His left side was bandaged by Dr. Howell. He remained bandaged during five weeks, when he was discharged by Dr. Howell as cured.

Mrs. Roux testifies that during the time Dr. Howell was treating plaintiff, he stayed in a barn in her backyard, and that he was bandaged on his left side; that he always complained of his left side and leaned on that side.

Mr. Day, son-in-law of Mrs. Roux, testifies that plaintiff was bandaged by Dr. Howell, and that after he had been discharged by Dr. Howell he bandaged plaintiff on the same spot, and which had the apparent effect of easing him. Thereafter, Mr. Day testifies, plaintiff was again bandaged by Dr. White. Mr. Day also says that in the morning plaintiff would groan and complain of his left side hurting him, and could hardly get up from his bed and not very "straight," and that he was "always leaning to that left side."

It is shown that at the time of the trial, more than a year after the accident, plaintiff was still wearing the bandage placed on his left side by Dr. White.

It is true that after his discharge by Dr. Howell, plaintiff returned to work at the docks for defendant company. His fellow workman, Mayo, says, however, that when plaintiff came back he could not handle, as he had before, a maul pounder of fertilizers, known as the Big Bertha. Mayo says he then helped plaintiff all he could in his work.

Counsel for defendant refer to the testimony of Mr. Voorhies under whom plaintiff worked at the Louisiana Rice Milling Company, after plaintiff had left his work with defendant corporation. Mr. Voorhies said he would not exactly call the work he gave plaintiff, as "straw bossing." It is true, Mr. Voorhies says, plaintiff did both hard and light work, but he testifies that in November plaintiff said to him that he did not know if he would be able to keep on with his work. It also appears that plaintiff, after he had left his employment with defendant, went to work for Knapp & East.

Mr. Quin, bookkeeper for Knapp & East, says plaintiff complained of having "hit his side," and that he had offered to send him to a physician.

The testimony of Mrs. Roux, her son-in-law, Mr. Day, the fact that bandages were worn by plaintiff up to the time of the trial, his complaint of suffering on his left side at the places where he worked after leaving the employment of defendant, his inability to handle the machinery he had been accustomed to handle at the docks, as explained by Mayo, are facts and circumstances corroborative of the testimony of Mayo and plaintiff, that he had been actually jammed between the truck and the door of the box car, as explained by them, although it may be that the position of plaintiff when he was extricated by Mayo was not seen by Thorne and Rankin.

It is not surprising that plaintiff should have suffered as appears from the testimony, facts and circumstances hereinabove referred to, when it is considered that he was fastened between a truck weighing 400 pounds, with 1,500 pounds on it, and the side door of that

box car, until he was extricated from that position by the pulling away of the truck.

The way the accident occurred and the consequences which resulted to plaintiff therefrom leave no basis to support the contention of defendant, that he had been only lightly injured.

The record shows that plaintiff was 28 years of age when he was hurt, and prior to that time was never known to have had the least difficulty in doing heavy work.

It is testified to by Mayo, and not contradicted, that it took an extra strong man to handle the Big Bertha, and very few could do it. Consideration of this fact makes it still more evident that the injury plaintiff suffered was not slight, as counsel for defendant would have it. If this injury had been light or slight, a man of that physical strength, still in the prime of manhood, would have soon recovered from its effects and would not have been subjected to bandages and pains for more than a year, and all of that time without relief.

It is shown that plaintiff had, while in the service of defendant company, been engaged in handling this heavy machinery for a year and a half before the occurrence of this accident. During all of that time he did his work without any apparent difficulty whatsoever, showing no signs of inability to render the services required of him. As his inability to continue his work immediately followed the accident, it is impossible to escape the conclusion that the cause of his subsequent physical condition was the direct result of that accident.

An X-ray picture of the left side of plaintiff's body was taken by Dr. McKinney, radiologist. It appears, from this picture, as explained by several physicians who testified in the case, that there was an erosion of the head of plaintiff's twelfth rib. These medical experts say that an abnormal condition existed at the head of that rib, which might have caused the trouble of which plaintiff complains. This abnormality, they also testify, may have been caused by some congenital or infectious disease. It appears from the opinion of two or three of these physicians that the injury to the top of this twelfth rib might have been caused by trauma.

They explain that this twelfth rib is a floating apparatus of the human body, naturally easily pushed off from one side to the other, and for that reason must receive a violent blow for a break to occur or an erosion to appear, at the spot, as was reflected in the X-ray picture taken by Dr. McKinney. The proof is that plaintiff never suffered any injury whatsoever from any accident prior to the one in question. It is therefore obvious that if there was any break at the top of that rib, it could not have been the result of an accident prior to the one in question.

The other source of the trouble, according to this expert testimony, could only be attributable to a congenital or infectious disease. If due to that, it is evident that such a disease was lurking in plaintiff's system at a time, unquestionably, prior to the accident.

It appears from the evidence that plaintiff had a heavy task imposed on him in the handling of this Big Bertha, that men only of unusual strength could handle. It cannot be doubted that he had, at times, to use all of his physical strength to meet the requirements of the work he was engaged in. Is it not therefore singular, and we may add passing strange, that during a period of more than one year while doing that work, if plaintiff had had an abnormality at the top of his twelfth rib, or was afflicted with any congenital or infectious trouble, that he never did, at any time, give the slightest manifestation of his inability to do his work? In connection with the foregoing observation, it is appropriate to note that plaintiff suffered with disability to do his work, immediately after the accident, and continued in that condition and was still bandaged at the trial of this case. Is it not logical to conclude under such facts and circumstances that the injury plaintiff received was due to trauma which some of the physicians said could have caused plaintiff's trouble?

All the experts testify that it would require considerable force to cause the condition which affected the head of the twelfth rib of the plaintiff, as was revealed by the X-ray picture. No doubt these experts were qualified to say that much force would be required to produce such a condition. All of that may be very true, but are these physicians, as medical experts, competent to estimate with any degree of accuracy what was the measure of the force which resulted from the impact of the truck with plaintiff when he suffered the injury? Is it possible to measure even approximately the force of that impact? When it is considered that the truck weighed 400 pounds, upon which was a load of 1,500 pounds, the impact by which plaintiff's left side was fastened to the door of the box car, in our opinion, must have been of tremendous force. If not so, a young man of 28, endowed with extra powers and strength, would have liberated himself and would not have remained there between the

truck and the box car door, until he was extricated by Mayo, his fellow workman.

Our opinion is that the injury was due to trauma caused by the impact.

In the case of Behan v. John B. Honor et al., 143 La. 348, 78 So. 589, L. R. A. 1918F, 862, it was held that where plaintiff suffers an accident which awakens or activates a dormant disease lurking in his system, he is entitled to recover under the compensation statute for disability resulting therefrom.

This doctrine has been followed in many decisions of our appellate courts since this rule was recognized in the Behan Case. In that case, the defense was that plaintiff's disability was not caused by the accident, but was the result of a disease lurking in his system.

In this case, there is no such defense in the pleadings, but evidence was admitted without objection to show that the cause of plaintiff's disability was due to the existence of some congenital or infectious disease lurking in his system. The fact is that the main theory of the defense is based on that conception of the case. Let us say, for the sake of the argument, that plaintiff was suffering with one of the several diseases referred to by the medical experts and which it is unnecessary to enumerate.

The point is, by what cause was any one of these diseases awakened, activated, or aggravated by the impact? No one, we think, could take the position that one of these lurking diseases, at the moment plaintiff was touched with that truck, sprang up from its own source and independently of the impact. The only possible logical conclusion must therefore be that the concealed disease, whatsoever it was, was activated or accelerated by the accident and which resulted in the disability of which plaintiff complains.

The injury was caused by the trauma, as before stated, and if not, the lurking disease was aggravated or accelerated by the accident, causing the disability and entitling plaintiff to compensation.

Plaintiff was working for defendant by the hour, and the evidence is not clear as to the amount he should recover for his weekly wage.

The testimony of Mr. Austin, manager of defendant company, is that the total earnings of the plaintiff, prior to his injury, averaged $9.78 per week. The testimony of the plaintiff is for a larger amount.

We shall fix his weekly wages at $10 per week, which we think is a fair average, and will allow him 65 per cent. of this weekly wage for permanent total disability, not, however, beyond 400 weeks.

The judgment appealed from must be reversed, and the decree, above indicated, entered in favor of plaintiff, less the amount per week received by plaintiff, until he was discharged as cured.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that plaintiff have judgment against defendant for a weekly wage of $6.65 for 400 weeks, and not beyond, less the payment of $50 for five weeks at $10 per week, received by plaintiff from October 14, 1932, to November 20th, when he was discharged as cured; and that defendant pay all costs in both courts.